Action Learning Assocs., LLC v. Kenan-Flagler Bus. Sch. Exec. Educ. LLC, 2025 NCBC 30.

STATE OF NORTH CAROLINA

ORANGE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV003280-670

ACTION LEARNING ASSOCIATES,
LLC,

      Plaintiff,

v.

KENAN-FLAGLER BUSINESS
SCHOOL EXECUTIVE
EDUCATION LLC; HEATHER
FREELAND; DAVID HOFMANN;
STEPHEN HYDE, and DOES 1
through 5,

      Defendants.

**ORDER AND OPINION ON MOTION
TO DISMISS FIRST AMENDED
COMPLAINT**

**THIS MATTER** is before the Court on Defendants Kenan-Flagler Business School Executive Education LLC ("KFEE"); Heather Freeland; David Hofmann; and Stephen Hyde's (collectively, "Defendants") Motion to Dismiss First Amended Complaint ("Motion to Dismiss" or the "Motion," ECF No. 15). Having considered the Motion, the parties' briefs, the arguments of counsel, the applicable law, and all other appropriate matters of record, the Court concludes that the Motion to Dismiss should be **GRANTED in part** and **DENIED in part** for the reasons set forth below.

    *Miano Law PC by Bert J. Miano for Plaintiff Action Learning Associates, LLC.*

    *Ellis & Winters LLP by Jonathan D. Sasser and Kyle A. Medin for Defendants Kenan-Flagler Business School Executive Education LLC; Heather Freeland; David Hofmann; and Stephen Hyde.*

Davis, Judge.

## INTRODUCTION

1. This case arises from the deterioration of a decade-long relationship between two businesses in the corporate leadership and executive education industry. For years, Plaintiff Action Learning Associates, LLC ("Plaintiff") contracted with KFEE to design and facilitate executive learning courses for KFEE's clients, including ExxonMobil. Plaintiff alleges that, beginning in 2022, KFEE began infringing on Plaintiff's proprietary material, soliciting Plaintiff's current and former employees, and misrepresenting the long-term prospects of the parties' contractual relationship in an effort to begin servicing ExxonMobil directly. Defendants now seek dismissal of all of Plaintiff's claims.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact in connection with a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the complaint and in documents attached to, referred to, or incorporated by reference in the complaint that are relevant to the Court's determination of the motion. *See, e.g., Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 12, 2017).

3. Plaintiff is a Colorado limited liability company that is primarily in the business of providing executive education services to businesses throughout the world. (Am. Compl. ¶¶ 1, 11.)

4. KFEE is a North Carolina non-profit limited liability company, which operates from the campus of the University of North Carolina at Chapel Hill and the

Kenan-Flagler Business School. (Am. Compl. ¶¶ 2, 14.) KFEE provides executive education services to private businesses through annual contracts with third-party providers, such as Plaintiff. (Am. Compl. ¶ 13.)

5. At all times relevant to this action, Freeland, Hofmann, and Hyde (collectively, the "Individual Defendants") were employed by KFEE. (Am. Compl. ¶¶ 3–5.)

6. Beginning in 2013, KFEE contracted with Plaintiff to provide executive development services to one of KFEE's corporate clients—ExxonMobil. (Am. Compl. ¶ 17.) The terms of the agreement were reflected in an Independent Contractor Scope of Work ("SOW") agreement between Plaintiff and KFEE. (Am. Compl. ¶ 19.)

7. Generally, Plaintiff was responsible for providing personnel to conduct executive development services through an Emerging Leadership Program—and later, a Business Leadership Program (together with the Emerging Leadership Program, the "ExxonMobil Programs")—to ExxonMobil executives in the Americas, Europe, and Asia. (Am. Compl. ¶¶ 17, 19.)

8. On 22 August 2019, KFEE engaged Plaintiff to redesign the Emerging Leadership Program for ExxonMobil. (Am. Compl. ¶ 20.)

9. The terms of the redesign were reflected in a Master Services Agreement ("MSA") and in the SOW. (Am. Compl. ¶ 21.) Specifically, the MSA provided that the contract would be for a one-year term, subject to renewal upon the mutual agreement of Plaintiff and KFEE. (Am. Compl. ¶ 21.)

10.     Between 2019 and 2022, the MSA was renewed on an annual basis, which resulted in Plaintiff expending significant resources across multiple years to redesign and develop unique materials for the ExxonMobil Programs.  (Am. Compl. ¶¶ 22–23.)

11.     On 30 September 2022, KFEE's Program Director, Tony Laffoley, contacted Plaintiff to inquire about its ability to expand its capacity to deliver the ExxonMobil Programs in three regions in 2024.  (Am. Compl. ¶ 29.)

12.     Plaintiff responded on 4 October 2022 by providing plans for expanding its capacity in 2024 and expressing its expectation that such an investment would be recouped by KFEE agreeing to renew the MSA for a period of at least five years.  (Am. Compl. ¶ 30.)

13.     Around that same time, while negotiating the 2023 renewal of the MSA, KFEE represented that Plaintiff could "get more fees in 2024" if Plaintiff "work[ed] with [KFEE] for 2023" by reducing its professional fees and discounting Plaintiff's programs in Europe and Asia.  (Am. Compl. ¶ 25.)

14.     In these negotiations and through "multiple conversations and emails" between late 2022 and July 2023, KFEE executives continued to make Plaintiff believe that the MSA would subsequently be renewed in 2024 and beyond.  (Am. Compl. ¶ 27.)

15.     Based on the promise of "more fees in 2024" and the belief that the MSA would continue to be renewed on a long-term basis, Plaintiff entered into a one-year

contract to renew the MSA on 6 January 2023 at discounted rates. (Am. Compl. ¶¶ 25–26.)

16. From January to June 2023, Plaintiff and KFEE continued discussing key details—such as pricing, scale, onboarding, and dates—for the ExxonMobil Programs in 2024. (Am. Compl. ¶¶ 31–33.)

17. On 23 May 2023, Hofmann (KFEE's Faculty Director for the ExxonMobil Programs) traveled to Singapore and met with Plaintiff's Lead Facilitator for Asia, Alexandre Paitre. (Am. Compl. ¶ 36.)

18. During the meeting, Hofmann expressed doubt that Plaintiff would continue to be involved with the Emerging Leadership Program beyond 2023 and inquired as to whether Paitre would be restricted in his ability to work directly with KFEE. (Am. Compl. ¶ 37.)

19. On 8 June 2023, Plaintiff's President, Scott Miller, attempted to schedule a meeting with KFEE leadership to discuss issues concerning Plaintiff's relationship with KFEE but was unable to do so. (Am. Compl. ¶ 45.)

20. The next day, Freeland (KFEE's Program Director) participated in a WhatsApp call with Plaintiff's Lead Facilitator in Europe, Kari Erickson (together with Paitre, the "Current Facilitators"). (Am. Compl. ¶ 38.)

21. During the call, Freeland told Erickson that the relationship between KFEE and Plaintiff was not going well and that KFEE was considering other options for 2024. (Am. Compl. ¶ 39.) Freeland inquired as to what Erickson thought about

contracting directly with KFEE to facilitate the ExxonMobil Programs in 2024. (Am. Compl. ¶ 40.)

22. Erickson rebuffed Freeland's suggestion and recommended that Freeland communicate directly with Plaintiff. (Am. Compl. ¶ 41.)

23. Erickson subsequently learned of Hofmann's meeting with Paitre and reported both incidents to Miller. (Am. Compl. ¶ 44.)

24. On 24 July 2023, Miller learned that KFEE had registered two of Plaintiff's former employees—Jenn Giordano and Ryan Soares (together, the "Former Facilitators")—as "observers" for an upcoming Emerging Leadership Program. (Am. Compl. ¶ 47.)

25. When pressed about why he had been scheduled to attend the Emerging Leadership Program, Soares informed Miller that he had signed a non-disclosure agreement with KFEE and that he had been instructed to keep his attendance on the "down low." (Am. Compl. ¶ 48.)

26. The next day, Miller contacted Hyde (KFEE's President) to discuss Freeland and Hofmann's solicitation of the Current Facilitators and Former Facilitators, as well as to express his concern regarding the need to protect Plaintiff's proprietary information relating to the ExxonMobil Programs. (Am. Compl. ¶ 51.)

27. However, instead of conducting an independent investigation into Freeland and Hofmann's conduct, Hyde informed them of his conversation with Miller so that they could "resolve" the situation with Plaintiff. (Am. Compl. ¶¶ 52–53.)

28. Shortly thereafter, on 10 August 2023, KFEE notified Plaintiff that the MSA would not be renewed for 2024 as it related to the Emerging Leadership Program in Europe and Asia. (Am. Compl. ¶ 59.)

29. Two weeks later, on 25 August 2023, KFEE informed Plaintiff that the MSA would not be renewed for 2024 with regard to the Business Leadership Program. (Am. Compl. ¶ 60.)

30. Plaintiff contends that rather than renewing the MSA, KFEE has instead hired the Former Facilitators and provided them with unauthorized access to Plaintiff's proprietary materials so that KFEE can facilitate the ExxonMobil Programs itself. (Compl. ¶¶ 61–62.)

31. Plaintiff initiated this action by filing a Complaint ("Complaint," ECF No. 3) in Orange County Superior Court on 19 November 2024 asserting various claims for monetary relief against Defendants.

32. This matter was subsequently designated to the Business Court and assigned to the undersigned on 22 January 2025. (ECF Nos. 1–2.)

33. On 11 February 2025, Defendants filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. (ECF No. 8.)

34. However, while that motion to dismiss was pending, Plaintiff filed an Amended Complaint ("Amended Complaint," ECF No. 12) on 10 March 2025. Therefore, the Court denied the motion to dismiss as moot. (ECF No. 14.)

35. In the Amended Complaint, Plaintiff reasserted the five claims for relief pled in the original Complaint—breach of contract, tortious interference with contractual relations, fraud and fraud in the inducement, unfair and deceptive trade practices ("UDTP"), and conversion. (*Compare* Compl. ¶¶ 1–109 *with* Am. Compl. ¶¶ 1–112.) In addition, the Amended Complaint alleged three new claims for relief— misappropriation of trade secrets, constructive fraud, and civil conspiracy. (Am. Compl. ¶¶ 112–38.)

36. Defendants filed the present Motion to Dismiss on 9 April 2025.

37. This matter came on for a hearing before the Court on 10 June 2025 at which all parties were represented by counsel. (*See* ECF No. 20.)

38. Having been fully briefed, the Motion to Dismiss is now ripe for resolution.

**LEGAL STANDARD**

39. In ruling on a motion to dismiss under Rule 12(b)(6), the Court may only consider the complaint and "any exhibits attached to the complaint[,]" *Krawiec v. Manly*, 370 N.C. 602, 606 (2018), in order to determine whether "as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some recognized legal theory," *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc.*, 336 N.C. 438, 442 (1994) (cleaned up). The Court must view the allegations in the complaint "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017) (cleaned up).

40.     "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up).

## ANALYSIS

41.     In the Motion to Dismiss, Defendants seek dismissal of all claims asserted against them in the Amended Complaint.  The Court will address each claim in turn.

## I.     Breach of Contract

42.     "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.  The elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms." *Davis v. Woods*, 286 N.C. App. 547, 561 (2022) (cleaned up).

43.     As an initial matter, Plaintiff concedes that the Individual Defendants are not parties to the MSA or the SOW.  Therefore, as non-parties to any contract with Plaintiff, the Individual Defendants cannot be liable for breach of contract.  *See Howe v. Links Club Condo. Ass'n*, 263 N.C. App. 130, 139 (2018) (stating that "as a matter of law, a non-party to a contract cannot be held liable for any breach that may have occurred"); *see also Loray Master Tenant, LLC v. Foss N.C. Mill Credit 2014 Fund I, LLC*, 2022 NCBC LEXIS 1, at *27 (N.C. Super. Ct. Jan. 11, 2022) (holding

that a "claim for breach of contract must be dismissed against [defendant] because it is a non-party to the [a]greement").

44.     Accordingly, the Motion to Dismiss Plaintiff's claim for breach of contract is **GRANTED** with respect to the Individual Defendants.

45.     With regard to KFEE, Plaintiff's claim for breach of contract is broadly premised on two purported breaches: (1) KFEE's decision not to renew the MSA in 2024, and (2) KFEE's breach of the confidentiality and non-disclosure provisions of the MSA.

**A.     Nonrenewal of the MSA**

46.     Plaintiff first asserts that KFEE's decision not to renew the MSA in 2024 amounts to a breach of its contracts with KFEE.  (Am. Compl. ¶ 74.)

47.     However, this theory contradicts the allegations in the Amended Complaint.  The Amended Complaint makes clear that Plaintiff's "work was reflected in a Master Services Agreement ('MSA') between KFEE and [Plaintiff] with a renewable one-year term" and that the terms of the renewal had to be negotiated and agreed upon by *both* Plaintiff and KFEE.  (Am. Compl. ¶ 21; *see also* Am. Compl. ¶¶ 24–25.)

48.     North Carolina caselaw is clear that absent a contractual right to renewal, a party's decision not to renew a contract does not give rise to a claim for breach of contract.  *See Fox v. Lenoir-Rhyne Univ.*, ___ N.C. App ___, 2024 N.C. App. LEXIS 966, at *10–14 (2024) (concluding that a university's decision not to renew an athletic scholarship that was "for one academic year" did not give rise to a claim for

breach of contract); *Gibbs v. Guilford Tech. Cmty. Coll.*, 2004 N.C. App. LEXIS 1487, at *12–13 (N.C. Ct. App. Aug. 17, 2004) (unpublished) (holding that an employer exercising its "reserved [] right of nonrenewal of any employment agreements" did not constitute a breach of contract).

49.     Therefore, because Plaintiff has failed to plead a contractual right to renewal, KFEE's decision not to renew the MSA in 2024 cannot support a claim for breach of contract.

50.     In apparent recognition of this defect, Plaintiff asserts in its brief that KFEE's decision not to renew the MSA also constitutes a breach of the implied covenant of good faith and fair dealing.

51.     As an initial matter, the Amended Complaint does not allege a violation of the implied covenant of good faith and fair dealing.  Instead, to the contrary, the Amended Complaint expressly alleges that "Defendants' retaliatory decisions not to renew the contract . . . are breaches of the *explicit* terms of the MSA and SOW."  (Am. Compl. ¶ 74 (emphasis added).)

52.     Under North Carolina caselaw, "'where a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, we treat the former claim as part and parcel of the latter,' so that the two rise and fall together."  *Vill. at Motts Landing Homeowners' Ass'n v. Aftew Props., LLC*, 2023 NCBC LEXIS 100, at *13 (N.C. Super. Ct. Aug. 14, 2023) (quoting *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 38–39 (2018)).

53.     Therefore, because Plaintiff's claim for breach of an express term of the MSA fails, so too does its claim for breach of the implied covenant of good faith and fair dealing based on identical facts. *See, e.g., Johnson Bros. Corp. v. City of Charlotte*, 2024 NCBC LEXIS 32, at *42 (N.C. Super. Ct. Feb. 27, 2024) (dismissing a claim for breach of the implied covenant of good faith and fair dealing where it was "based on the same alleged facts as [the] claim for breach of contract").

54.     Accordingly, KFEE's Motion to Dismiss Plaintiff's claim for breach of contract and breach of the implied covenant of good faith and fair dealing based on its decision not to renew the MSA in 2024 is **GRANTED**.

**B.      Sections 8 and 9 of the MSA**

55.     Plaintiff further contends that KFEE violated the MSA's confidentiality and non-disclosure provisions set out in Sections 8 and 9. In support of this assertion, the Amended Complaint alleges as follows:

> Section 8 of the 2023 MSA prohibits KFEE from sharing [Plaintiff's] confidential information with any third party and from using any of [Plaintiff's] confidential information outside the terms of the SOW.

> KFEE manages access to [Plaintiff's] work product, proprietary materials, and intellectual property (deemed "Contractor materials" in the MSA) which in the case of the ExxonMobil program is stored on KFEE's SharePoint server.

> . . .

> Defendants have permitted nearly 70 unauthorized individuals to have uncontrolled access to [Plaintiff's] proprietary material and intellectual property through KFEE's SharePoint server despite repeated requests by [Plaintiff] that access to that content be restricted pursuant to Section 8 of the MSA.

> . . .

Section 9 of the 2023 MSA bars KFEE from any

> right to use, copy, modify, execute, reproduce, display, perform, sublicense, and distribute, either internally or externally, any portion of Contractor materials or deliverables in any form. Furthermore, [KFEE] shall not prepare derivative works based upon or authorize any third-party use of Contractor materials or deliverables.

> The executive education program designed and developed by [Plaintiff] for ExxonMobil contains [Plaintiff's] proprietary material and intellectual property.

> Defendants have allowed unauthorized third parties to use, copy, modify, reproduce, display, perform, and distribute [Plaintiff's] proprietary Contractor materials and to prepare derivative works based upon [Plaintiff's] proprietary Contractor materials and deliverables.

> . . .

> Defendants' retaliatory decisions . . . to hire third parties including former [Plaintiff] facilitators to use [Plaintiff's] proprietary materials to implement a program designed and developed by [Plaintiff] are breaches of the explicit terms of the MSA and SOW.

(Am. Compl. ¶¶ 63–64, 67, 70–72, 74.)

56.     As Defendants' counsel candidly acknowledged at the 10 June hearing, these allegations are sufficient to satisfy the low bar of notice pleading for claims of breach of contract. *See Dunn Holdings I, Inc. v. Confluent Health LLC*, 2018 NCBC LEXIS 215, at *14 (N.C. Super. Ct. Dec. 10, 2018) (concluding that "[w]hile the allegations are bare-boned . . . [d]efendants' allegations meet the low bar for breach of contract claims set by North Carolina's notice pleading standard"); *see also LFF IV Timber Holding LLC v. Heartwood Forestland Fund IV LLC*, 2024 NCBC LEXIS 119, at *18 (N.C. Super. Ct. Sept. 6, 2024) (noting that "[a]lthough [plaintiff] will, of course, have to make a more detailed showing at later stages of this litigation . . . its

allegations are sufficient to pass muster under" the "relatively low bar" of notice pleading for claims of breach of contract).

57. Therefore, KFEE's Motion to Dismiss Plaintiff's claim for breach of contract as it relates to the alleged breaches of Sections 8 and 9 of the MSA is **DENIED**.

## II. Tortious Interference with Contractual Relations

58. Our Supreme Court has articulated the following elements of a tortious interference with existing contract claim:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Lab'ys, Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988) (cleaned up).

59. Plaintiff claims that Defendants have tortiously interfered with the following two categories of agreements: (1) Plaintiff's contracts with KFEE and (2) Plaintiff's contracts with the Former Facilitators.

### A. Contracts with KFEE

60. As to Plaintiff's first theory—that Defendants tortiously interfered with Plaintiff's contracts with KFEE—the Amended Complaint alleges as follows:

> As described more fully above, the Parties entered into a series of valid and enforceable agreements, including the 2023 Master Services Agreement ("2023 MSA") and its incorporated Scope of Work ("SOW").
>
> . . .
>
> Defendants were aware of the existence of the contracts referenced above.

Defendants intentionally interfered with those contractual relations without justification.

(Am. Compl. ¶¶ 82, 84–85.)

61.     However, as Plaintiff's counsel acknowledged at the 10 June hearing, one cannot legally interfere with a contract to which it is a party. *See, e.g., Lineage Logistics, LLC v. Nat'l Union Fire Ins. Co.*, 2023 NCBC LEXIS 97, at *42 (N.C. Super. Ct. Aug. 10, 2023) (stating that "[g]enerally, a party cannot interfere with its own contract[s]").

62.     Therefore, Plaintiff cannot proceed on this theory against KFEE itself.

63.     Plaintiff attempts to salvage this claim by asserting that the Individual Defendants committed the alleged tortious interference by inducing KFEE to breach the terms of the MSA and SOW. Plaintiff argues that these actions were taken outside the course and scope of the Individual Defendants' employment duties such that they can be held individually liable for this conduct.

64.     However, the most basic problem with this argument is that it is not supported by the allegations in the Amended Complaint, which does not specifically allege that the Individual Defendants took any action to induce KFEE to breach its contracts with Plaintiff. Therefore, this theory lacks merit.

**B.     Contracts with Former Facilitators**

65.     As to Plaintiff's second theory, Plaintiff asserts that Defendants interfered with Plaintiff's contracts with its Former Facilitators—Giordano and Soares.

66.     Plaintiff concedes that neither Giordano nor Soares were employed by Plaintiff during the time period at issue.  Rather, Plaintiff argues that Giordano and Soares were subject to non-disclosure agreements with Plaintiff and that Defendants induced them to breach those agreements.  However, once again, the allegations in the Amended Complaint do not support Plaintiff's theory.

67.     Aside from general references to Plaintiff's "contractual relationships" with the Former Facilitators, the Amended Complaint does not allege that Giordano was subject to a non-disclosure or confidentiality agreement with Plaintiff.

68.     Furthermore, even accepting the conclusory allegation that Soares was subject to a non-disclosure or confidentiality agreement with Plaintiff, a careful reading of the Amended Complaint reveals that there are no allegations that Defendants actually attempted to induce Soares to breach that agreement by sharing confidential information with KFEE.  As a result, this theory is also defective.

69.     Therefore, Defendants' Motion to Dismiss Plaintiff's claims for tortious interference with contractual relations is **GRANTED**.

## III.    Fraud and Fraudulent Inducement

70.     To state a valid claim for fraud, a plaintiff must allege "(1) [a] representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ward v. Fogel*, 237 N.C. App. 570, 581 (2014), *disc. rev. denied*, 368 N.C. 249 (2015).

71.     Our Supreme Court has held that the elements of claims for fraud and fraudulent inducement are identical. *Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*, 385 N.C. 250, 264 (2023). As a result, the Court shall consider the two claims together. *See Hale v. MacLeod*, 294 N.C. App. 318, 328 (2024) (stating that "because the elements for showing fraud and fraudulent inducement are identical, we consider the first and second causes of action together"); *B&D Software Holdings, LLC v. Infobelt, Inc.*, 2024 NCBC LEXIS 103, at *10 (N.C. Super. Ct. Aug. 1, 2024) (analyzing claims for fraud and fraudulent inducement together).

72.     "Claims of fraud are held to a heightened pleading standard pursuant to Rule 9(b) of the North Carolina Rules of Civil Procedure." *Julian v. Wells Fargo Bank, N.A.*, 2012 NCBC LEXIS 32, at *19 (N.C. Super. Ct. May 22, 2012) (cleaned up). The particularity requirement of Rule 9(b) "is met by alleging [the] time, place and content of the fraudulent representation, [the] identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85 (1981). "An alleged misrepresentation must be 'definite and specific.'" *Value Health Sols., Inc.*, 385 N.C. at 263. If a fraud claim is premised on a promissory representation, "facts must be alleged from which a court and jury may reasonably infer that the defendant did not intend to carry out such representations when they were made." *Whitley v. O'Neal*, 5 N.C. App. 136, 139 (1969) (cleaned up).

73. In support of its claims for fraud and fraudulent inducement, Plaintiff largely relies on vague and conclusory allegations. Such allegations include the following:

> During negotiations for the 2023 renewal contract, [Plaintiff] agreed to lower its professional fees and give KFEE a discount on programs in Europe and Asia with the express promise that [Plaintiff] could "get more fees in 2024" if [Plaintiff] "work[ed] with us for 2023."
>
> . . .
>
> Through multiple conversions and emails from late 2022 and as late as July 2023 between executives of KFEE and [Plaintiff], Defendants led [Plaintiff] to believe the current MSA would be renewed into 2024 and beyond. Plans and program dates for the 2024 program were discussed and confirmed.
>
> During these discussions, [Plaintiff] expressed its understanding that its investment of resources into developing these educational materials for ExxonMobil's use since 2019 would be recouped by continued renewal of the MSA contract in 2024 and beyond.
>
> . . .
>
> [Plaintiff] continued its efforts to design and develop programming for ExxonMobil throughout 2022 and 2023 in reliance on multiple express and implied representations by KFEE that [Plaintiff] would be able to recoup its costs and discounted rates through continued renewal of its contract with KFEE to provide services to ExxonMobil over a period of years.
>
> . . .
>
> These misrepresentations and concealment[s] were reflected in phone conversations and emails between Scott Miller of [Plaintiff] and multiple representatives of KFEE, including Program Director Tony Laffoley and others.

(Am. Compl. ¶¶ 25, 27–28, 34, 89.)

74. These allegations fall far short of the Rule 9(b) particularity requirement in that they (1) allege broad windows of time in which the purported

statements were made; (2) fail to describe the specific and definite contents of the alleged representations; and (3) fail to identify the specific speaker attributable to each statement. *See Value Health Sols., Inc.*, 385 N.C. at 266 (finding the allegation that the misrepresentation was made "[d]uring a yearlong due diligence period and negotiations" insufficiently particular as to time); *Alamance Fam. Prac., P.A. v. Lindley*, 2018 NCBC LEXIS 83, at *31 (N.C. Super. Ct. Aug. 14, 2018) (concluding that the claim was inadequate when "the tim[ing] of the representations is [pled] only as a broad range").

75.     The only statement referenced in the Amended Complaint that alleges the time, place, content, and speaker of a communication is that "[o]n September 30, 2022, [Plaintiff] was asked by Program Director Tony Laffoley about expanding [its] capacity to deliver [the ExxonMobil Programs] in all three regions (Americas, APAC, and EMEA) for 2024." (Am. Compl. ¶ 29.)

76.     However, this allegation alone is insufficient because it fails to allege that Laffoley made a misrepresentation of fact or promissory representation. Rather, Laffoley's statement, as described, is limited to an inquiry as to Plaintiff's ability to provide services in the future. There are no specific allegations that Laffoley promised or otherwise represented that KFEE would engage Plaintiff's services in the future or that he knew at the time that he made the inquiry that KFEE intended not to renew the MSA in 2024.

77.     Therefore, the Motion to Dismiss Plaintiff's claims for fraud and fraudulent inducement is **GRANTED**.

## IV. Conversion

78. "There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (cleaned up). "In cases where the defendant comes into possession of the plaintiff's property lawfully, the plaintiff must show that it made a demand for the return of the property that was refused by the defendant." *Morris Int'l v. Packer*, 2021 NCBC LEXIS 99, at \*27 (N.C. Super. Ct. Nov. 2, 2021) (citing *Hoch v. Young*, 63 N.C. App. 480, 483 (1983)).

79. Plaintiff's theory of conversion is—in a nutshell—that the materials it designed for the ExxonMobil Programs are its own property, which Defendants have wrongfully converted. In support of this theory, the Amended Complaint alleges as follows:

> KFEE manages access to [Plaintiff's] work product, proprietary materials, and intellectual property (deemed "Contractor materials" in the MSA) which in the case of the ExxonMobil program is stored on KFEE's SharePoint server.
>
> . . .
>
> Defendants have permitted nearly 70 unauthorized individuals to have uncontrolled access to [Plaintiff's] proprietary material[s] and intellectual property through KFEE's SharePoint server despite repeated requests by [Plaintiff] that access to that content be restricted pursuant to Section 8 of the MSA.
>
> . . .
>
> The executive education program designed and developed by [Plaintiff] for ExxonMobil contains [Plaintiff's] proprietary material and intellectual property.

. . .

> Plaintiff is the lawful owner of proprietary training and program materials that are and have been at all relevant times in the possession and control of KFEE.

> Defendants intended to and did wrongfully deprive Plaintiff of its property interest in these materials by allowing access to third parties who have and are using the materials without legal or equitable authority.

> Defendants' wrongful acts are inconsistent with the property rights of Plaintiff.

> Defendant KFEE has refused to release Plaintiff's proprietary materials to Plaintiff or to protect them from unauthorized access and have allowed third parties to continue to use the material[s] without permission.

(Am. Compl. ¶¶ 64, 67, 71, 106–09.)

80. In its briefs, Defendants' sole argument for dismissal of the conversion claim is that to the extent the claim alleges conversion of Plaintiff's intellectual property, such property interests are intangible in nature and cannot be the subject of a conversion claim.[1]

81. "North Carolina does not recognize a claim for conversion of intangible interests, and our courts have determined that this includes" intellectual property rights. *BIOMILQ, Inc. v. Guiliano*, 2024 NCBC LEXIS 58, at \*42 (N.C. Super. Ct. Apr. 19, 2024) (cleaned up); *see also Window World of N. Atlanta, Inc. v. Window*

---

[1] At the 10 June hearing, Defendants' counsel attempted to articulate additional grounds for dismissal of the conversion claim. However, the Court will not consider arguments on a motion that are raised for the first time at a hearing and were not briefed. *See Charles Schwab & Co. v. Marilley*, 2024 NCBC LEXIS 27, at \*16 n.4 (N.C. Super. Ct. Feb. 20, 2024), (refusing to consider an argument that "was not briefed, and therefore inappropriately raised for the first time in oral argument), *aff'd per curiam*, 387 N.C. 185 (2025); *see also* BCR 7.2 (stating that "a party should . . . brief each issue and argument that the party desires the Court to rule upon and that the party intends to raise at a hearing").

*World, Inc.*, 2018 NCBC LEXIS 111, at \*9–10 (N.C. Super. Ct. Oct. 22, 2018) (dismissing a conversion claim because neither "contract rights [nor] trademark rights . . . [are] tangible property upon which a claim for conversion may be based").

82.     "On the other hand, electronically stored information may qualify as personal property subject to a claim for conversion." *SQL Sentry, LLC v. ApexSQL, LLC*, 2017 NCBC LEXIS 107, at \*5 (N.C. Super. Ct. Nov. 20, 2017) (cleaned up); *see also HCW Ret. & Fin. Servs., LLC v. HCW Empl. Benefit Servs., LLC*, 2015 NCBC LEXIS 73, at \*61–62 (N.C. Super. Ct. July 14, 2015) (dismissing a claim for conversion of trademarks but holding that there is no "basis to conclude as a matter of law that depriving [plaintiff] of the customer and sales information by cutting off his access to [electronic software] could not provide a basis for a conversion claim, when taking the same information printed into hard copy form would be sufficient"); *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 51, at \*15 (N.C. Super. Ct. June 9, 2017) (holding that "[t]he better view, and the weight of authority, treats electronic documents as personal property subject to a claim for conversion"); *A Distrib. Co. LLC v. Mood Prod. Grp. LLC*, 2024 NCBC LEXIS 130, at \*24 (N.C. Super Ct. Sept. 26, 2024) (holding that "[w]hile conversion claims do not generally extend to intangible property, the PDF [files] are 'electronic documents' that constitute personal property subject to a claim for conversion").

83.     Here, the allegations in the Amended Complaint can be properly read as asserting that at least some electronic documents stored on KFEE's servers—as opposed to purely intangible intellectual property interests—are the subject of

Plaintiff's conversion claim. Thus, KFEE has failed to articulate a valid basis for dismissal of this claim.

84. However, there is no basis to support a conversion claim against the Individual Defendants because there are no allegations that any of the Individual Defendants converted any of the electronic documents at issue. *See, e.g., Glob. Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 104, at *24 (N.C. Super. Ct. Oct. 9, 2018) (dismissing a claim for conversion against an individual defendant where "the facts ple[d] do not support an allegation that [the individual defendant] was involved in the conversion").

85. Therefore, the Motion to Dismiss Plaintiff's claim for conversion is **DENIED** as to KFEE but **GRANTED** as to the Individual Defendants.

## V. Misappropriation of Trade Secrets

86. Plaintiff further alleges that Defendants are liable for misappropriation of its trade secrets.

87. North Carolina's Trade Secrets Protection Act ("NCTSPA") provides that "[t]he owner of a trade secret shall have [a] remedy by civil action for misappropriation of his trade secret." N.C.G.S. § 66-153.

88. The NCTSPA defines a "trade secret" as:

[B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

    a.    Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b.  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

89.  Furthermore, "misappropriation" is defined as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-152(1).

90.  In the present case, the most basic problem with Plaintiff's claim is that the Amended Complaint fails to even come close to describing the alleged trade secrets with the requisite degree of specificity.

91.  Our Supreme Court has recognized that "[t]o plead [a claim for] misappropriation of trade secrets, a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec*, 370 N.C. at 609 (cleaned up). Moreover, "a complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated, is insufficient to state a claim for misappropriation of trade secrets." *Id.* at 610 (cleaned up).

92.  This Court has made clear that broad allegations regarding the misuse of a plaintiff's "product information" are insufficient to state a claim for misappropriation of trade secrets. *Aecom Tech. Corp. v. Keating*, 2012 NCBC LEXIS

9, at *8 (N.C. Super. Ct. Feb. 6, 2012); *see also Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *68 (N.C. Super. Ct. Nov. 3, 2011) (finding the purported trade secret description as "proprietary formulas, methodologies, customer and pricing data and other confidential information" to be too "sweeping and conclusory . . . to identify the trade secrets the [defendants] [were] accused of misappropriating").

93. The Amended Complaint describes Plaintiff's purported trade secrets as follows:

> Plaintiff is the lawful owner of proprietary training and program materials that are and have been at all relevant times in the possession and control of KFEE.
>
> These proprietary training and program materials contain trade secrets developed and owned by Plaintiff at all relevant times. Among Plaintiff's trade secrets are the specific presentations and exercises developed by Plaintiff and its personnel for use in providing services to ExxonMobil through its contracts with KFEE, as specified in the annual SOWs, which include the curriculum designed and developed by [Plaintiff] for the ExxonMobil Business Leadership Program (BLP) and the ExxonMobil Emerging Leaders[hip] Program (ELP).
>
> Plaintiff has taken repeated and affirmative steps to identify its trade secrets in contracts with KFEE . . . .

(Am. Compl. ¶¶ 113–15.)

94. Plaintiff's identification of its purported trade secrets provides little more than what our Supreme Court in *Krawiec* found to be inadequate. *See Krawiec*, 370 N.C. at 611 (holding that "plaintiffs' failure to . . . provide any detail about their dance productions renders their claim too general for this Court to determine . . . whether there is a formula, pattern, program, device, compilation of information, method, technique, or process at issue that derives independent actual or potential

commercial value from not being generally known or readily ascertainable through independent development or reverse engineering").

95.     Here, the Amended Complaint fails to provide any detail or description of the "specific presentations and exercises" at issue so as to enable this Court to determine whether the requirements of § 66-152(3) have been satisfied. *See, e.g., Comput. Design & Integration, LLC v. Brown*, 2018 NCBC LEXIS 216, at \*35 (N.C. Super. Ct. Dec. 10, 2018) (concluding the description in plaintiff's complaint of the trade secret was "broad, vague, and" insufficiently particular when described as "proprietary and unique solutions, engineering drafts and plans, potential solutions and configurations, correspondence with potential customers, and information technology needs of each customer").[2]

96.     Therefore, the Motion to Dismiss Plaintiff's claim for misappropriation of trade secrets is **GRANTED**.

## VI.     Constructive Fraud

97.     Our Supreme Court has recognized that the elements of a constructive fraud claim largely overlap with the elements of a claim for breach of fiduciary duty. *See Chisum v. Campagna*, 376 N.C. 680, 706–07 (2021). "[A] cause of action for constructive fraud [requires] (1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3)

---

[2] Because Plaintiff's failure to identify its purported trade secrets with sufficient detail is alone sufficient to require dismissal of the misappropriation of trade secrets claim, the Court need not address Defendants' other argument that the Amended Complaint fails to specifically allege that reasonable security measures were taken by Plaintiff to protect the secrecy of these materials.

that plaintiff was, as a result, injured." *White v. Consol. Planning Inc.*, 166 N.C. App. 283, 294 (2004) (cleaned up). "The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself." *Id.*

98. "[I]t is axiomatic that '[f]or a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties.'" *Truist Fin. Corp. v. Rocco*, 2024 NCBC LEXIS 62, at *29 (N.C. Super. Ct. Apr. 25, 2024) (quoting *Dalton v. Camp*, 353 N.C. 647, 651 (2001)). A fiduciary relationship is generally found to exist when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367 (2014) (cleaned up). "North Carolina recognizes two types of fiduciary relationships: *de jure*, or those imposed by operation of law, and *de facto*, or those arising from the particular facts and circumstances constituting and surrounding the relationship." *Hager v. Smithfield E. Health Holdings, LLC*, 264 N.C. App. 350, 355 (2019) (cleaned up).

99. Plaintiff concedes that it has not alleged a *de jure* fiduciary relationship. Instead, Plaintiff asserts that Defendants owed Plaintiff *de facto* fiduciary duties based on the parties' long-term business relationship and Plaintiff's act of entrusting KFEE with its proprietary and confidential information.

100. This Court has previously stated the following with regard to the circumstances that may give rise to *de facto* fiduciary duties:

> A *de facto* fiduciary relationship exists where there is "confidence reposed on one side, and resulting domination and influence on the

other." *Dalton*, 353 N.C. at 652 (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598 (1931)) (cleaned up). "The standard for finding a *de facto* fiduciary relationship is a demanding one: 'Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen.'" *Lockerman v. S. River Elec. Membership Corp.*, 250 N.C. App. 631, 636 (2016) (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613 (2008)).

Pertinent to the present Motion, "[o]ur courts have been clear that general contractual relationships do not typically rise to the level of fiduciary relationships." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 340 (2019). Notably, "[p]arties to a contract do not thereby become each other's fiduciaries; they generally owe no special duty to one another beyond the terms of the contract[.]" *Id.* (quoting *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 61 (1992)). Even where one party is in the "position as the holder of the purse strings," "no [fiduciary] relationship arises absent the existence of dominion and control by one party over another." *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 474 (2009). Thus, "[a]s a matter of law, there can be no fiduciary relationship between parties in equal bargaining positions dealing at arm's length[.]" *French Broad Place, LLC v. Asheville Sav. Bank, S.S.B.*, 259 N.C. App. 769, 788 (2018) (citation and internal quotation marks omitted). "In the event that a party 'fail[s] to allege any special circumstances that could establish a fiduciary relationship,' dismissal of a claim which hinges upon the existence of such a relationship would be appropriate." *Azure Dolphin, LLC v. Barton*, 371 N.C. 579, 599 (2018) (citation and internal quotation marks omitted).

*Loray Master Tenant, LLC*, 2022 NCBC LEXIS 1, at *31–32.

101. Here, the Amended Complaint does not allege that KFEE exercised domination or control over Plaintiff. To the contrary, the Amended Complaint alleges that Plaintiff was "instrumental" in KFEE obtaining contracts with ExxonMobil because of Plaintiff's "ability to field local resources in Asia and Europe, as well as informing many of the design elements of the core program." (Am. Compl. ¶ 18.) Such an allegation demonstrates that Plaintiff was not powerless in its relationship with KFEE. *See Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C.

App. 615, 621 (2012) (noting that contracting parties do not owe fiduciary duties to each other "even if they are mutually interdependent businesses").

102. Furthermore, this Court has recognized that the mere exchange of confidential and proprietary information pursuant to a contract does not—standing alone—create a fiduciary relationship. *See Volume Servs., Inc. v. Ovations Food Servs., L.P.*, 2018 NCBC LEXIS 108, at *38–41 (N.C. Super. Ct. Oct. 17, 2018) (finding no fiduciary duty where the plaintiff allegedly "placed trust and confidence in the [defendant], 'through execution of certain agreements,' . . . pursuant to which the [defendant] agreed to protect [p]laintiffs' confidential business information"); *see also Husqvarna Pro. Prods., Inc. v. Robin Autopilot Holdings, LLC*, 2023 NCBC LEXIS 155, at *13–14 (N.C. Super. Ct. Nov. 28, 2023) (concluding that an "agreement to maintain the confidentiality of [plaintiff's] trade secrets and other confidential information . . . does not give rise to a fiduciary duty" where the complaint did not allege any "duties or damages separate and apart from those created by contract").

103. Ultimately, the Amended Complaint alleges that KFEE obtained Plaintiff's confidential and proprietary information pursuant to the terms of the MSA and that KFEE subsequently breached its confidentiality obligations. This is simply not enough to demonstrate the existence of a fiduciary relationship. *See Crescent Foods, Inc. v. Evason Pharms, Inc.*, 2016 NCBC LEXIS 76, at *20–21 (N.C. Super. Ct. Oct. 5, 2016) (holding that merely "trust[ing] [d]efendant to honor the terms of [an] agreement do[es] not transform its relationship into a fiduciary one").

104.	Therefore, Defendants' Motion to Dismiss is **GRANTED** as to Plaintiff's claim for constructive fraud.

## VII.	UDTP

105.	"To prevail on a claim of unfair and deceptive trade practice[s][,] a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 460 (1991) (cleaned up).

106.	Our Court of Appeals has recognized that "a defendant's mere act of tortious conversion can satisfy the elements of a Chapter 75 claim." *Faucette v. 6303 Carmel Rd., LLC*, 242 N.C. App. 267, 276 (2015) (cleaned up). Accordingly, because the Court has concluded that Plaintiff sufficiently stated a claim for conversion against KFEE, Plaintiff can proceed with its UDTP claim against it. *See, e.g., Miller v. Redgoose, L.L.C.,* 2024 NCBC LEXIS 148, at *20 (N.C. Super. Ct. Nov. 26, 2024) (noting that "the continuing viability of" a claim for conversion "automatically serves as a predicate for a UDTP claim to proceed").

107.	As a result, the Court need not decide at the present time whether any of Plaintiff's other allegations are independently sufficient to support its UDTP claim against KFEE.

108.	Because the Court has dismissed all of Plaintiff's claims (including the conversion claim) as to the Individual Defendants, there are no predicate claims that could serve as a basis for the UDTP claim to survive against them.

109. Moreover, based on its careful review of the Amended Complaint, the Court concludes that Plaintiff has failed to sufficiently allege acts by the Individual Defendants sufficient to support a claim for UDTP.

110. Therefore, the Motion to Dismiss Plaintiff's claim for UDTP is **DENIED** as to KFEE but **GRANTED** as to the Individual Defendants.

## VIII. Civil Conspiracy

111. In order to state a claim for civil conspiracy, a plaintiff must allege: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Piraino Bros., LLC v. Atl. Fin. Grp., Inc.*, 211 N.C. App. 343, 350 (2011) (cleaned up).

112. Notably, "[c]ivil conspiracy is not an independent cause of action in North Carolina. Rather, liability for civil conspiracy must be alleged in conjunction with an underlying claim for unlawful conduct." *McCarron v. Howell*, 2024 NCBC LEXIS 144, at *17 (N.C. Super. Ct. Nov. 19, 2024) (cleaned up); *see also Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002) (holding that "[o]nly where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement").

113. Plaintiff's conspiracy claim fails for at least two reasons.

114. First, at the 10 June hearing, Plaintiff's counsel argued that the underlying causes of action for unlawful conduct serving as the predicate for its civil

conspiracy claim are the claims for tortious interference with contractual relations and misappropriation of trade secrets. However, because the Court has now dismissed both of those claims, Plaintiff's claim for civil conspiracy fails on that ground alone. *See, e.g., S. Fastening Sys., Inc. v. Grabber Constr. Prods., Inc.*, 2015 NCBC LEXIS 42, at *20 (N.C. Super. Ct. Apr. 28, 2015) (noting that "[i]f the underlying [claims] supporting a claim for conspiracy are dismissed, so too must the claim for conspiracy be dismissed").

115. Second, dismissal of this claim is also proper because the Amended Complaint fails to allege either an actual agreement to commit an unlawful act or the identity of the purported conspirators with any degree of specificity. *See Bottom v. Bailey*, 238 N.C. App. 202, 213 (2014) (affirming dismissal where "[t]he claim suggest[ed] that defendants . . . conspired, but fail[ed] to allege how th[e] conspiracy came to be, or when, or where, or why"); *Trail Creek Invs. LLC v. Warren Oil Holding Co.*, 2023 NCBC LEXIS 70, at *45–46 (N.C. Super. Ct. May 9, 2023) (dismissing a civil conspiracy claim because it was "unclear as to which of the [d]efendants [were] actually being alleged to have engaged in such a conspiracy" and where the pleading made no "attempt to differentiate between the numerous individuals and entities who are named as [d]efendants").

116. Therefore, Defendants' Motion to Dismiss Plaintiff's claim for civil conspiracy is **GRANTED**.

## IX.     Dismissals With or Without Prejudice

117.    Finally, Plaintiff requests that if the Court concludes that dismissal of any of its claims is proper, the dismissal be without prejudice in order to allow it to amend those claims.  The Court declines to do so.

118.    "The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]"  *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013) (cleaned up).  When dismissing claims pursuant to Rule 12(b)(6), "the party whose claim is being dismissed has the burden to convince the court that the party deserves [another] chance[.]"  *Id.* at 192 (cleaned up).

119.    Each of Defendants' present arguments made in support of their Motion to Dismiss the claims for breach of contract, tortious interference with contractual relations, fraud and fraudulent inducement, and UDTP are essentially identical to the arguments made by them in support of their original motion to dismiss.  Yet despite Plaintiff having effectively been given a roadmap of the deficiencies in these claims, a line-by-line comparison of the allegations in the original Complaint with the allegations in the Amended Complaint reveals that Plaintiff took virtually no action to address the defects identified by Defendants in their original motion to dismiss these same claims.

120.    Plaintiff has now had two bites at the apple to plead sufficient facts to support its various claims arising from these events and has failed to convince the Court that it should be given a third.  *See Lafayette Vill. Pub, LLC v. Burnham*, 2025 NCBC LEXIS 23, at *23 n.9 (N.C. Super. Ct. Mar. 4, 2025) (dismissing claims with

prejudice when the plaintiffs had "filed two legally deficient fiduciary duty claims" because "it would be [in]appropriate to give them a third bite at the apple"); *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at \*14 (N.C. Super. Ct. Oct. 21, 2016), (dismissing claims with prejudice after the plaintiff had been "afforded . . . the opportunity to re-plead his claims" and where the complaint's pleading deficiencies had already been "specifically identified").

121. For these reasons, the Court concludes, in the exercise of its discretion, that the claims dismissed herein should be dismissed *with* prejudice.

## CONCLUSION

**THEREFORE, IT IS ORDERED** as follows:

1. Defendants' Motion to Dismiss is **DENIED** as to Plaintiff's claim against KFEE alleging a breach of contract as to Sections 8 and 9 of the MSA, Plaintiff's claim against KFEE for conversion, and Plaintiff's claim against KFEE for UDTP.

2. In all other respects, Defendants' Motion to Dismiss is **GRANTED** with prejudice.

**SO ORDERED**, this the 2nd day of July 2025.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases